IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA :
         : CRIMINAL ACTION NO.
   v.      :
         : 1:12-CR-323-WSD
EDWARD K. KIM    :

<u>DEFENDANT'S SENTENCING MEMORANDUM</u>

The Defendant, EDWARD K. KIM, by and through undersigned counsel, hereby submits this sentencing memorandum in support of a reasonable sentence under 18 U.S.C. § 3553(a).  Mr. Kim respectfully asks that this Court impose a sentence at the <u>low end</u> of the advisory guideline range.  In committing the three robberies in August, Mr. Kim was selfish, indulgent, and dangerous.  His violent crimes have forever changed the lives of his victims and of himself.  Until August, Mr. Kim had never before committed crimes remotely like these.  Through this sentencing memorandum, counsel will describe Mr. Kim's heroin addiction, his repeated attempts to leave heroin behind, and his recurring depression following each failed effort at sobriety.  Counsel does not offer this history as an excuse, but only as an answer — however unsatisfactory — to the question: Why did Mr. Kim commit these crimes?

 A. *Mr. Kim's History of Drug Addiction*

Counsel for Mr. Kim is no expert in psychology or addiction.  He will not

attempt to look behind the veil of Mr. Kim's deep and lengthy attachment to drugs. Instead, counsel will simply provide the Court with the historical facts surrounding the addiction. By hand delivery earlier today, counsel has provided to the Court a series of records from various treatment centers and hospitals. In the mean time, counsel will summarize the records in this sentencing memorandum by citing and quoting particular highlights. In the end, this history does not excuse the violent crimes Mr. Kim committed. Indeed, many heroin addicts do not take up armed robbery in order to support a habit. Yet the addiction is the prologue to Mr. Kim's crimes and, in that way, offers some insight into his inexcusable choices. The enclosed records include the following information:

- On June 11, 2008, Mr. Kim intentionally overdosed on heroin in the hope of killing himself. (Def't Ex. 6 at FOR005). As an ambulance took him to Northside Hospital Forsyth, he told the EMS staff that "he tried to come off the drug, but he can't" and "if he [could] he would be off the drug." *Id.* Mr. Kim said that "he wants to die so he will not do this again." *Id.* On that morning, Mr. Kim ingested an extraordinary amount of heroin in a very short time: $200 worth went into two needles and then into his left arm. *Id.* This was two or three times the amount he then used in a typical day. (Def't Ex. 6 at FOR006). At that

point, he had been using heroin for two years and was "sick and tired of it." *Id.* He had recently stolen money from his sister and "fe[lt] hopeless and worthless," he had separated from his wife "due to drug use, " and "he was intentionally trying to end his life with the amount of heroin he used today." Def't Ex. 6 at FOR0021). The blood work tested positive for opiates. (Def't Ex. 6 at FOR007, FOR0013). The hospital staff later noted that Mr. Kim "obviously use[d] street drugs." *Id.*

-   Later that same day, on June 11, 2008, Mr. Kim was admitted to Laurelwood Hospital of Gainesville following the intentional overdose, which the doctor labeled "almost lethal." (Def't Ex. 1 at LAU003, LAU016). At Laurelwood, the physician diagnosed Mr. Kim with "severe opiate dependence." (Def't Ex. 1 at LAU005). He also noted "opiate dependence/withdrawal," "organic mood disorder with depression secondary to drug use," and "very high risk of harm to himself as evidenced by depressive symptoms, suicidal ideation, intentional overdose of heroin to kill himself prior to this admission which he planned for several weeks prior to the overdose as well as a previous suicide attempt via an overdose in October 2007." (Def't Ex. 1 at LAU004).

3

- At Laurelwood, Mr. Kim reported that if he relapsed, he would seek inpatient treatment "very quickly, since his suicide attempts in the past have occurred after he has relapsed with opiates, and he becomes increasingly depressed with feelings of guilt." (Def't Ex. 1 at LAU005).

- Mr. Kim reported that "he [could] not stop using" heroin. (Def't Ex. 1 at LAU006). It was "his intent to die at the time he took the overdose," that he "does not have depressive symptoms during periods of sobriety," that his "longest recent sobriety was 4 months, which ended in December 2007," and that "when he relapsed with opiate dependence . . . he soon begins to feel very depressed." *Id.*

- The staff at Laurelwood suggested various interventions, which Mr. Kim agreed to, including "inpatient stabilization," "group therapy," "12-step program," and medications. (Def't Ex. 1 at LAU012). In spite of this regimen, the staff noted Mr. Kim's "high risk of relapse and use of opiates." (Def't Ex. 1 at LAU016).

- For fifteen months between June 2008 and September 2009, Mr. Kim lived at the Prodigals Community, an inpatient treatment center in North Carolina. (Def't Ex. 2 at PROD001). The program admitted him as a heroin addict. (Def't Ex. 2 at PROD005). When he arrived at the program, Mr. Kim wrote that "[a]fter losing my wife, job, and house,

the thought of suicide had crossed my mind.  I could not quit using heroin and so I attempted to commit suicide."  (Def't Ex. 2 at PROD008).

- As he entered the Prodigals program, Mr. Kim expressed himself in these words: "The past three years of drug abuse has primarily been oxycontin and heroin along with alcohol.  The impact of my drug usage upon my life has been incredibly huge.  Due to drugs I have ruined my marriage, lost jobs and lost my home to foreclosure.  I truly believe my life can be restored if I could learn to function without the use of drugs and alcohol.  I have been sober for a week now and am praying that I get accepted into this program to continue my sobriety and learn to live as a sober member of society."  (Def't Ex. 2 at PROD009).  Mr. Kim criticized himself as "spiritually bankrupt."  (Def't Ex. 2 at PROD0053).

- Mr. Kim progressed through the various phases of the Prodigals program and by the end of the 15-month program, in September 2009, he reached the most advanced — the "senior" — stage and graduated from the program.  (Def't Ex. 2 at PROD0073).

- The success lasted only a few months.  By February 27, 2010, Mr. Kim spiraled back into heavy heroin use, which led him once again to do violence to himself through an attempted suicide.  (Def't Ex. 3 at

NOR003).  Mr. Kim tried to hang himself with neckties inside a hotel room, the noose snapped, he called a suicide hotline, and was admitted to <u>Northside Hospital</u>.   (Def't Ex. 3 at NOR0011).  He told the hospital that he shot heroin, tried to get off it, and failed; he said that "he just [did] not want to live anymore."  *Id.*  The hospital's blood test showed that Mr. Kim had several illegal drugs, including opiates, in his system.  (Def't Ex. 3 at NOR0026).  The staff noted that he was going through heroin withdrawal.  (Def't Ex. 3 at NOR0209).  Mr. Kim told the staff that he "gets crazy when attempting to withdraw from heroin."  (Def't Ex. 3 at NOR0030).

-  In April 2010, with the help of the Forsyth County court system, Mr. Kim enrolled in <u>Potter's House</u>, a part of the Atlanta Union Mission.  (Def't Ex. 4 at POT005).  He arrived, once again, for intervention in his addiction to heroin and other opiates.  (Def't Ex. 4 at POT0032).  Mr. Kim believed then that he would "learn to live clean and sober again." (Def't Ex. 4 at POT0013).  He was forthright with the staff about his addiction, his failed treatment in the past, and his criminal history. (Def't Ex. 4 at POT0017).  After four months in the program, Mr. Kim was discharged because he used nicotine.  (Def't Ex. 4 at POT0023).

-  In December 2011, Mr. Kim enrolled in another inpatient treatment

6

center: <u>Turning Point</u> in Gainesville, Georgia.  (Def't Ex. 5 at TUR005).

The twelve-month program required Mr. Kim to participate in group

counseling, take at least two random drug screens per week, attend

daily self-help meetings, and find a job.  *Id.*  Mr. Kim got off to a good

start: he was "doing well in class," "often leading group discussion,"

"attending 12 step meeting," and "usually shar[ing] stuff in the group

discussion."  (Def't Ex. 5 at TUR007).  By January 2012, Mr. Kim was

employed and attending group meetings and 12-step programs.  (Def't

Ex. 5 at TUR006).  Mr. Kim attended multiple 12-Step programs and

passed multiple drug tests each week.  (Def't Ex. 5 at TUR0015).  In

early 2012, Mr. Kim relapsed by using cocaine, received a jail sanction

from the Forsyth County Drug Court, and returned to Turning Point

to try again.  (Def't Ex. 5 at TUR0030, TUR0032).  In April and May, he

continued to work at the Nissan dealership, (PSR ¶ 94), pass drug tests

and meet the program's many requirements.  (Def't Ex. 5 at TUR0018,

TUR0021, TUR0024). Mr. Kim tested positive for opiates a second time

in June 2012 and, as a result, the program terminated him.  (Def't Ex. 5

at TUR002).  From this point forward, Mr. Kim again fell into the

whirlpool of heroin addiction, where he swam until he committed the

violent crimes in this case.

B.     *The Vulnerable Victim Enhancement Ought Not Apply to the Facts of this Case*

The probation officer has correctly chosen not to apply the "vulnerable victim" enhancement to this case.  (PSR ¶ 42).  Although the enhancement may apply to a victim who is "unusually vulnerable due to age," it should not apply to the facts of this case.  U.S.S.G. § 3A1.1, comment. n.2.  The government mistakenly argues that Baleigh Haas, the victim in the carjacking count, was a "vulnerable victim."  To be clear, Mr. Kim placed Ms. Haas in grave peril.  He caused her lasting emotional harm.  We do not discount her suffering during the robbery or minimize the painful effects since.  Indeed, the sentencing guideline range already accounts for the collection of harms Mr. Kim caused Ms. Haas.  The adjusted offense level includes enhancements based on Mr. Kim's use of the firearm in striking Ms. Haas in the head (six levels), the physical injury Mr. Kim caused her, (two levels), the abduction at gunpoint in search of an ATM machine (four levels), and the carjacking itself (two levels).  (PSR ¶¶ 37-40).  These *14 levels worth* of enhancements adequately capture the varying forms of harm — including the lasting terror — to this victim.

First, although Ms. Haas has suffered both physical injury and ongoing emotional harm, her age and continuing fear alone did not render her "vulnerable" under the guidelines.   In order to apply this enhancement, a given victim's vulnerability must be "unusual."  U.S.S.G. § 3A1.1, comment. n.2.  Although Mr.

Kim put Ms. Haas in great danger, he did so only in the manner that many defendants do when they commit an armed carjacking.  The use of the gun, the threats, the injury, and even the abandonment on the side of the road are part of many carjackings.  This alone is not enough.  Instead, the vulnerability that triggers § 3A1.1 "must be an 'unusual' vulnerability which is present in only some victims of that type of crime."  *United States v. Davis*, 967 F.2d 516, 523-24 (11th Cir. 1992).  "[T]he correct inquiry is not whether a given [carjacking] victim was vulnerable, but whether [the robber] specifically targeted a particular victim who was 'more vulnerable than the normal [carjacking] victim."  *Id.*  Ms. Haas — in suffering lasting fear and pain — has reacted just as we might expect of a carjacking victim of any age.  It was a frightening and life-changing event, but this is true even for most adult victims of this crime.

Second, at the time Mr. Kim committed the crime, he neither "knew" nor "should have known" that Ms. Haas was 16 years old.  U.S.S.G. § 3A1.1(b)(1).  Without such knowledge, the enhancement cannot apply.  Mr. Kim had no reason to know that Ms. Haas was 16 years old until she told him so after the crime was well under way.  (PSR ¶ 15).  The two were already in the car when Mr. Kim demanded she take him to an ATM and she responded at that time by telling Mr. Kim her age and that she had no ATM cards.  The vulnerable-victim enhancement is not, as the government implies, akin to the eggshell-skull tort question in law

school; a robber does not have to take his victim as she comes and suffer the consequence. Under § 3A1.1, he must know (or should have known) of a victim's vulnerability. Here Mr. Kim did not know and should not have known that a young woman driving a car alone at night in a mall parking lot was, in fact, a teenager with a new driver's license.

Third, Mr. Kim did not target Ms. Haas as a victim because of any perceived vulnerability. This is not, for example, a case in which a defendant specifically selects his victims precisely because they are children. *See United States v. Amedeo*, 370 F.3d 1305, 1317-1318 (11th Cir. 2004) (defendant sold drugs to a known drug addict); *United States v. Melvin*, 187 F.3d 1316, 1322 (11th Cir. 1999) (defendant commits fraud on children in hospital). Although it is no longer required that a defendant target the victim because of her vulnerability, *see United States v. Gonzalez*, 183 F.3d 1315, 1326 (11th Cir. 1999), this fact is relevant in deciding whether he knew or should have known she was vulnerable. In this case, Mr. Kim's selection of a teenager was accidental. Mr. Kim's pattern of behavior in this set of crimes shows he did not intend to target any vulnerable person, including a teenager. For example, the victims in the Bejewelled and Rite Aid robberies were adults. (PSR ¶¶ 14, 17). Indeed, even in the carjacking event, Mr. Kim clearly sought an adult victim because only an adult, one must presume, would be able to visit an ATM machine with credit or debit cards in order to withdraw money on demand. As Mr. Kim

10

chose a victim late at night in a mall parking lot, he had every reason to assume that as Ms. Haas got out of the driver's seat of a car, she was an adult. Mr. Kim was wrong, as he learned later, and his angry reaction to Ms. Haas once she told him she was merely 16 years old demonstrates that he affirmatively did not want to target anyone but an adult. (PSR ¶ 15). This set of facts is akin to the example in the guideline's Application Note 2, which states that the enhancement "would not apply in a case in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile." U.S.S.G. § 3A1.1, comment. n.2. Mr. Kim's unintended selection of a teenager makes all the difference on this enhancement.

Lastly, the government relies heavily on facts which tilt *against* application of the enhancement. (PSR ¶ 42). When the victim told Mr. Kim midstream that she was merely 16 years old and lacked a debit card, his angry response shows that he intended to find an adult capable of withdrawing money from a bank. Although Mr. Kim took Ms. Haas' wallet and cellphone, this is highly common in carjackings, where the robber typically tries to prevent a victim from calling the police as the robber departs. It hardly rendered Ms. Haas more unusually vulnerable compared to other carjacking victims. Although the government suggests that Ms. Haas' youthfulness somehow led her to react more passively, the facts show that she behaved in a mature and safe manner. Ms. Haas was coherent enough to follow Mr.

Kim's demands, to drive away from the mall at his direction, to stop and park the car, and to flag down a passing motorist once she was left alone. The government seems to find significance in Ms. Haas' supposed missed "opportunity to escape," but she reacted as most adult victims react when faced with the barrel of a gun: she followed her captor's instructions rather than risk further harm by chancing an escape. Although she was very upset, of course, Ms. Haas was able to give the police that same night a detailed (and accurate) verbal and written description of Mr. Kim, right down to the "small drawstring backpack."

The government concedes in its objection that "in the context of violent crimes, the Eleventh Circuit has only dealt with age as a vulnerability when the victim was an infant, a preteen or an elderly person." There may be a lack of case law on this topic because district courts do not apply the enhancement to 16-year-old robbery victims and, consequently, defendants have no need to raise the issue on appeal. In any event, the government here offers only a Fifth Circuit case published nearly a quarter-century ago. *United States v. Rocha*, 916 F.2d 219, 244045 (5th Cir. 1990). However, the *Rocha* opinion is distinguishable from the case before this Court and does not support the government's position here. Unlike Mr. Kim, the defendants in *Rocha* "chose[] . . . the kidnaping victim because of his age." *Id.* at 244. Moreover, the defendants in *Rocha* stopped brandishing firearms and, in order to convince the victim not to escape, they intentionally played upon his youthful

immaturity by making up a fictional tale that "the Colombians" would hunt him down if he got away. *Id.* at 244-45. The Fifth Circuit did not hold that the victim's evident terror, even at trial, was alone sufficient to presume he was "vulnerable," but merely supported the conclusion that he was susceptible to the threats made up by the defendants in an effort to keep him captive. *Id.* at 245. The Fifth Circuit simply held that under these unique facts, the district court's application of the enhancement was not clearly erroneous. *Id.* This unsurprising result does not require the same outcome in Mr. Kim's very different set of facts. Ms. Haas' age did not render her more vulnerable to carjacking than any other person alone in a vast parking lot late at night.

In the end, the government bears the burden of persuasion in convincing this Court that this victim is *unusually* vulnerable compared to the typical carjacking victim. *United States v. Young*, 527 F.3d 1274, 1276-77 (11th Cir. 2008) ("The burden of proof for establishing that a sentence enhancement is warranted lies with the prosecution and it is the duty of the district court to insure that the prosecution carries its burden of proof.") (citation omitted). It has failed to meet this burden and, therefore, this Court ought not apply the enhancement to Mr. Kim's guideline calculations.

<u>Conclusion</u>

The low end of the advisory guideline range — 252 months or approximately

13

*two decades* in a federal prison — is adequate punishment for these frightening and dangerous crimes.  Counsel urges this Court to impose just such a sentence.

Dated:  This the 11th day of February, 2013.

Respectfully submitted,

/s/ *W. Matthew Dodge*
W. Matthew Dodge
Attorney for Mr. Kim
Georgia State Bar No. 224371

Federal Defender Program, Inc.
101 Marietta Street, N.W., Suite 1500
Atlanta, Georgia 30303
(404) 688-7530  Fax (404) 688-0768
Matthew_Dodge@FD.org

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing *Defendant's Sentencing Memorandum* was formatted in Book Antiqua 13 pt., in accordance with Local Rule 5.1C, and was electronically filed this day with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to Joseph Plummer, Assistant United States Attorney, 600 Richard B. Russell Building, 75 Spring Street, S.W., Atlanta, Georgia, 30303.

Dated:  This the 11th day of February, 2013.

/s/ *W. Matthew Dodge*
W. Matthew Dodge